# EXHIBIT A

PAUL A. HILDING, ESQ.
State Bar No. 110656
hilding@hildinglaw.com
JAMES H. PYLE, ESQ.
State Bar No. 224121
jpyle@hildinglaw.com
HILDING LAW FIRM
501 W. Broadway, Suite 1760
San Diego, California 92101
Tel: (619) 233-4200
Fax: (619) 233-4211

SUZANNE BURKE SPENCER, ESQ.
State Bar No. 188597
sspencer@sallspencer.com
SALL SPENCER CALLAS & KRUEGER APC
32351 Coast Highway
Laguna Beach, California 92651
Tel: (949) 499-2942
Fax: (949) 499-7403

Attorneys for Plaintiff/Counter-Defendant
SIGMA FINANCIAL CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| SIGMA FINANCIAL CORPORATION, a Michigan corporation,<br><br>Plaintiffs,<br><br>v.<br><br>GOTHAM INSURANCE COMPANY, a New York corporation, et al.<br><br>Defendants.<br><br>AND RELATED COUNTER-CLAIM. | Case No.  8:15-cv-1531-AG-DFM<br><br>**PLAINTIFF/COUNTER-DEFENDANT SIGMA FINANCIAL CORPORATION'S EXPERT WITNESS DISCLOSURE**<br><br>**[Fed. R. Civ. P. 26(a)(2)]** |

Pursuant to Federal Rules of Civil Procedure 26(a)(2), Plaintiff/Counter-Defendant SIGMA FINANCIAL CORPORATION ("Sigma") hereby discloses the report of its designated expert witness, Frederick J. Fisher, J.D., CCP, which is attached hereto as Exhibit "A."

Sigma hereby notifies all other parties that since discovery in this action has not been completed, including, but not limited to, the depositions of Cadence Insurance Brokers, Inc., CalSurance and related witnesses and expert witnesses, and since additional information, claims and/or documents may be revealed after the date of Mr. Fisher's report, Sigma expressly reserves the right of its designated expert to augment or otherwise amend the attached expert report as such discovery is completed and/or any other facts, circumstances, witnesses or other matters are discovered by Sigma and/or its expert witness.

Respectfully submitted,

DATED:  May 16, 2017

**SALL SPENCER CALLAS & KRUEGER**
A Professional Corporation

By: _____
        Suzanne Burke Spencer

Attorneys for Plaintiff/Counter-Defendant
SIGMA FINANCIAL CORPORATION

**PLAINTIFF/COUNTER-DEFENDANT SIGMA FINANCIAL CORPORATION'S
EXPERT WITNESS DISCLOSURE**

# PROOF OF SERVICE

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 32351 Coast Highway, Laguna Beach, California 92651-6703.

On **May 16, 2017**, I served the foregoing document described as **PLAINTIFF/COUNTER-DEFENDANT SIGMA FINANCIAL CORPORATION'S EXPERT WITNESS DISCLOSURE** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope, addressed as follows:

## SEE ATTACHED SERVICE LIST

**[X] By mail**, I deposited such envelope(s) in the mail at Laguna Beach, California, with postage thereon fully prepaid.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Laguna Beach, California, in the ordinary course of business.  (FRCP 5(b)(2)(C)).

[ ] By Personal Service, I caused such envelope(s) to be delivered by hand from Laguna Beach, California, to the person identified above or at the person's office to a clerk or other person in charge or, if no one is in charge, to a conspicuous place in the office of the addressee(s)above. (FRCP 5(b)(2)(A), (B)).

[ ] (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**[X] (Federal)** I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on **May 16, 2017** at Laguna Beach, California.

Anna Nathan

**PLAINTIFF/COUNTER-DEFENDANT SIGMA FINANCIAL CORPORATION'S EXPERT WITNESS DISCLOSURE**

SERVICE LIST

Jennifer L. Brockett
James G. Parker
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017-2566
Email: jenniferbrockett@dwt.com
Email: jamesparker@dwt.com

*Attorneys for Defendant/Cross-Defendant and Cross-Complainant BROWN & BROWN PROGRAM INSURANCE SERVICES, INC.*

David Gorney
MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
801 S. Figueroa Street, 15th Floor
Los Angeles, California 90017-3012

*Attorneys for Defendant and Cross-Defendant CADENCE INSURANCE BROKERS, INC.*

Mark C. Goodman
Brandon P. Rainey
HOGAN LOVELLS US LLP
3 Embarcadero Center, Suite 1500
San Francisco, California 94111
Email: markgoodman@hoganlovells.com
Email: brandon.rainey@hoganlovells.com

*Attorneys for Defendant and Counter/Cross-Complainant GOTHAM INSURANCE COMPANY*

**PLAINTIFF/COUNTER-DEFENDANT SIGMA FINANCIAL CORPORATION'S
EXPERT WITNESS DISCLOSURE**

**EXHIBIT A**

# REPORT

of

## Frederick J. Fisher, J.D., CCP

### Background and Experience

I am currently the President of California based Fisher Consulting Group, Inc. (hereinafter FCG), and Excess Liability Managers Insurance Services, Inc. (hereinafter ELM). FCG provides Professional Consulting services as respects Specialty Lines Insurance Policy Quality Control, Risk Management, Claims Consulting and Expert Witness Services. ELM is a California Licensed Insurance production facility and follows a Managing Underwriter model for a specific and unique Excess Insurance product. I previously was the Founder, President and post-acquisition Sr. Vice–President of E.L.M. Insurance Brokers, Inc., a California based Insurance Production facility which followed a Wholesale Business Model and also acted as a Managing Underwriter (with non-resident licenses in 40 States). I have been a licensed California Insurance Producer for over 22 years, and a licensed California Insurance Claims Adjuster for over 38 Years. As my Company's original compliance officer, I am familiar as to the Licensing and Compliance practices required of Insurance Production facilities as may be required in one's Home State and in States where Non-Resident Licenses are obtained.

Over the past 42 years, I have amassed extensive experience as a licensed Insurance Producer, Surplus Lines Broker, Managing Underwriter, Compliance Specialist, Insurance Underwriter, Claims Adjuster, and Risk Management and Insurance Consultant. I have extensive experience with, and have written several publications regarding, Commercial General Liability and Professional Liability Insurance issues. I have lectured extensively on these topics in live presentations, webinars and video presentations. As related to this matter, I have extensive experience with the standard of care, customs, and practices of insurance professionals, in particular Insurance Agent & Broker Professional Liability inclusive of Wholesale operations and how they are distinguished from Managing General Agent/Underwriter operations. I have extensive experience with the standard of care, customs, and practices of Insurers as respects to quoting, binding and issuing polices whether working with a Wholesale Broker, Retail Broker, or the policyholder direct. I have trained Insurance Company Claim Departments on Fair Claims Practices, Bad Faith Issues and Claims Made Coverage issues.

As the Founder of an Insurance Production facility, I have specialized in the placement of Professional Liability Insurance including insuring other Insurance Production Facilities. My firm has also acted as a Managing Underwriter, placing coverage in 40 States. As a result, I am well versed in analyzing operations, exposures and the unique operational risks associated therein. Such would be consistent with the concept of understanding the risks and hazards to be covered together with the proper manner in which to verify the coverage requested was the coverage provided.

I pioneered Loss Control Programs for Insurance producers starting in 1978, and qualitative Claims and Underwriting auditing techniques for many Insurance Companies and self-insured's using proprietary techniques to identify and rectify qualitative issues. The result was significant savings for the client and a reduction in unnecessary litigation. Many of these techniques are in use today. These techniques grew from my hands on experience as a Claims Adjuster and Claims TPA Manager handling and resolving Professional Liability claims, including 1000's of claims involving Insurance Brokers. All of these claims arose from claims made insurance policies.

I am a member of Agents of America as respects their Risk Management and Loss Control educational materials for Insurance Agents and Brokers as well as the advisory Committee of the Claims and Litigation Management Alliance's College of Claims-School of Professional Liability.

For over 26 years, I have been the Senior Technical Advisor for *Professional Liability Insurance*, a three volume reference Manual published by the International Risk Management Institute (hereinafter referred to as IRMI). These manuals were used by the Professional Liability Underwriting Society (hereinafter PLUS) as part of the required course materials for the original and renowned Registered Professional Liability Underwriter (RPLU) designation. As PLUS introduced new and updated Course materials, I served as a Special Materials Expert on many of those Course Modules.

I have served as a Founding Faculty member and Member of the Executive Council, Claims College- School of Professional Lines sponsored by the Claims & Litigation Management Alliance. Successful completion leads to the obtaining of the Certified Claims Professional designation (CCP). I am an instructor on Professional Liability lines for Level 1, Level 2 and Level 3 Classes. I have authored or co-authored courses at each level and been a Course Instructor at each "College" since its inception in 2013. The Course materials included Bad faith avoidance at each of the 3 levels.

My qualifications are set forth in my Curriculum Vitae, attached hereto as Exhibit A and incorporated herein.

**Scope of Retention**

I was asked to opine on matters as to whether the Broker and Wholesale Broker(s) in this case acted consistent with the Standard of Care, or outside normal customs & practices as respects to the obtaining and placement of Excess Insurance with Gotham Insurance Company together with related subsumed issues. I will also opine as to whether Gotham Insurance Company's actions as to how they underwrote, bound and issued their policy and related issues was consistent with normal Insurance Business Practices, and subsumed issues. I am also prepared to testify at Trial or any other Proceeding relative to the foregoing.

**Fee Schedule**

I charge $450 per hour (irrespective of the outcome my opinions or ultimate outcome of this case), travel and other itemized expenses at cost, and 50% of travel time. I have no expectation, nor would I accept any payment, beyond my hourly rate and, itemized expenses.

**Documents Reviewed**

I have reviewed those documents and items as listed in Exhibit B as well as relying on my 42 year career experience.

**A Brief Review of Relevant Insurance Production Processes**

Typically, a policyholder will make a decision that he needs to acquire certain types of insurance. He then will go to a licensed Insurance Producer, and arrange to submit an application to that Producer. The licensed Insurance Producer will then either send the application directly to an insurance company the Producer has direct contact with, utilize the services of a wholesale Insurance Broker to access Markets, or deal directly with an Insurer's MGA when possible. Ultimately the application will be reviewed, either rated or declined, and a quote will be issued. The quote will itemize coverage, the premium, any Fees and if requested, a copy of the specimen policy form and all endorsements. Often, especially with Specialty Lines coverages as in the case herein, the standard has been to always provide specimen forms & endorsements.

If the consumer wishes to purchase the policy, he will comply with all conditions of the quote as received, or any other additional terms that may lawfully be required.

**A Brief Review of the difference between a  "Quote" and an "Indication"**

Based on my 42 years of experience, there are differences as to what is an indication and what is a quote. Generally, an indication provides a "rough" idea on what the Insurer may wish to charge, and what other coverage terms they may be willing to provide and/or exclude.  They will usually communicate what additional items may be required by them to review prior to issuing firm terms in the form of a (bindable) quote.

A Quote is usually one that is bindable. It provides pricing, may provide additional options at the discretion of the Underwriter, and will often include a list of any endorsements, together with providing copies of the forms and endorsements to be issued as the Policy.  Conditions that may still be required, such as a currently signed & dated Application, any required Warranties, and other documents may also be communicated.  These items may be required at the time the bind order is sent or within a stated reasonable time thereafter at the discretion of the Underwriter.

Binders are generally issued by the insurer or its authorized representatives in order to evidence the fact an insurer is at risk. It is temporary, allowing time for an Insurer to physically release the Policy.  Most States statutorily define an insurance "Binder". Traditionally, a binder is a legal agreement issued by either an agent, or an insurer to provide temporary evidence of insurance until a policy can be issued. Binders should contain definite time limits, should be in writing, and should clearly designate the insurer with which the risk is bound. They should also indicate the amount of insurance, the type of policy, and (in the case of property insurance) the perils insured against

**A Brief Discussion of the Differences between Admitted and Non-Admitted Insurers**

A "Non-admitted Insurer" is an insurer not entitled to transact insurance business in the State. However, a "non-admitted Insurer" may transact Insurance in a particular State by complying with that State's Laws and Regulations concerning how a non-admitted insurer may do so.  "Non-admitted insurance" is often colloquially referred to as "Surplus Lines" and/or "hard to place" due to past claims history, volatile exposures, or one of a kind items such as an actor or actress's physical attributes. One of the benefits of being a Non-admitted Insurer is the fact that neither rates nor policy forms need be filed and approved. Thus, a Non-admitted Insurer may increase or decrease premium rates as it sees fit as well as being able to offer broader or more restrictive policy forms as it sees fit.

Most States, permit the placement of coverage with a Non-admitted Insurer, but only through licensed Surplus Lines Brokers, and after other requirements have been met as provided for in any given State. Model Surplus Lines Insurance Statutes and regulations are provided by the National Association of Insurance Commissioners (hereinafter the NAIC) that any given State may decide to use "as is" or modify as they see fit.

A key provision of most State laws is the requirement that the Surplus Lines Broker "transacting" the placement collect a Surplus Lines Premium Tax from the policy holder and remit same to the State since "Non-Admitted Insurers "are not taxed on their premium volume like their "Admitted" counterparts. The Transacting Surplus Lines Broker is also required to file placement reports to State Authorities in which the coverage was placed based on the Insured's State of residency. This has been defined as being the State where their Home Office is located.

**A Brief Review of Licensing Processes of Insurance Production Firms**

There are many types of insurance licenses. For purposes of this report, I will be focusing only on those licenses that may be applicable to this case and thus ignore such licenses as Special Lines Surplus Lines Broker, Life Agent License, Accident and Health licenses etc. Licenses such as "Brokers, Agents, and/or Producers ", "Intermediaries" and "Surplus Lines Brokers" are the relevant licenses in this case.

Every State may have differing policies and procedures with respect to the licensing of Insurance Producers. Some States may require that any and all Admitted Insurers only do business with licensees with whom they have written contracts and/or "appointments" which may be required to be registered with State authorities. These may be called producer contracts, agency contracts, or producer agreements. Some States may require that any and all Admitted Insurers must only do business with "appointed" agents in that particular State, although the State may also distinguish between agent and broker. Almost all States allow licensees in other States to transact in a State where they are not domiciled by obtaining a "Non-Resident" license.  This includes Entities and Natural Persons as well as Surplus Lines licensees.

There are many meanings to the usage of "Agent" or "Producer". There is the colloquial usage of the word "agent", the Common Law definition (often much broader in scope than simply limited to the insurance world), and the Statutory definition as may exist in any given State. An "agent," or "Insurance Producer" as may be Statutorily defined in a given State, generally means a person *authorized, by and on behalf of an insurer*, to transact all classes of insurance other than life, disability, or health insurance, on behalf of an *admitted insurance company*."

An Agent's License may be issued to a natural person or organization that acts on behalf of an insurer. A "broker" and/or Producer may be an "agent" of the insured in those States that distinguish between Agent and Broker , or where the "producer" is placing Insurance with a non-admitted Insurer and using an "intermediary" such as a Wholesale Broker to do so. It is universal that a non-admitted Insurer cannot have an Agent in the State. Equally true is the fact that a Non-Admitted Insurer may *only* transact insurance with either a licensed Surplus Lines Broker or with the Insured directly under certain conditions.  In essence, any licensed Broker, whether following a retail model or wholesale model, is still an Agent, Statutorily, of the Policyholder in obtaining the coverage sought.

## A brief review of Limits and Aggregates- How they are Supposed to Work

Generally, Specialty Lines Insurance Policies, such as Professional Liability and Error & Omission policies, are issued with single limits, such as $1 million per claim, and $1 million in the aggregate. Thus, supposedly, an insured could have two $500,000 Claims and be fully covered for both as the aggregate is not exceeded.  They could also have three or more claims of various amounts so long as the total for same is not over $1 million.

While many polices are issued with "split limits" where the policy aggregate is higher, most polices are not. As Specialty Line Polices became more complicated and offered more and  more coverages, limits per coverage and how they might affect the "aggregate" equally became complicated.  I know of one Cyber policy with 14 separate Coverages, each with a $1million Limit, and a policy aggregate of $1million, whereas some might have thought they were getting $14 million in coverage for $1300!

Equally true is the fact that as limits and sub-limits (and their impact on the aggregate) became more complicated, the potential for a misunderstanding as to how one wants it to work increased. When "Excess Insurance" is obtained, the complexity is magnified even with a "following Form" intended to actually simplify matters.

In essence, Primary limits of $2 million per claim and a $10 million aggregate should work no differently than as above, i.e., an Insured could make many claims, but the insurer would pay nothing more than $2 million for any one claim, and would not pay more than $10 million for all.

When a sub-limit for a particular type of exposure or claim(s) is used, such as $1 million per claim and $5 million aggregate (yet a policy aggregate of $10 million), the complexity gets magnified. In essence, an insured could have many claims in the sub-limit area, but the Insurer would never pay more than $1 million per claim. When the amount paid for all claims total $5 million, no more of that type of claim would be paid, and the total policy aggregate would obviously be reduced to $5 million for all other covered claims.  When a following form Excess

as the overall Primary Total Policy aggregate.

**Neutral Statement of Facts**

The following are neutral facts from  the "ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT" (hereinafter referred to as ODPMPSJ),  and other sources as noted. This includes Internet accessible State License records for the Organizations and individuals discussed below and Archive.org records :

The "Plaintiff" Sigma is a financial services company. "Gotham" is an insurance company. CalSurance is an insurance broker and was Sigma's insurance agent. "Cadence is the managing general agent of Gotham and served as a wholesale broker" in this transaction. (ODPMPSJ)

As stated in the agreement between Cadence and Gotham, Cadence was authorized to

> "procure on Our behalf, in all 50 states, applications for insurance policies to be issued by Us in the broker-dealer and registered investment advisor program (the 'Broker-Dealer Program') through New York Marine & General Insurance Company and Gotham Insurance Company, subject always, however, to Our underwriting standards and guidelines."

Cadence did not have the authority to "underwrite" any of the applications they obtained, nor issue any Indications or Policies that weren't authorized or prepared by Gotham. Those services were exclusively retained by Gotham.  Cadence does not fit the definition of a Managing General Agent as defined in the Codes in California, Wisconsin, or Michigan.

CalSurance is domiciled in California and was, and still maintains, a California Agent-Broker License, and Surplus Lines License. They have a non-resident Producer License in Michigan. They do not have a Non-resident entity license to "transact" Surplus Lines Insurance in Michigan. A Natural Person employee of CalSurance, Lynne Kimmel Johnson, does hold an Individual non-resident License in Michigan as a Producer and Surplus Lines Broker. Based on the materials I have reviewed, Ms. Johnson was not the person that "solicit(ed) insurance," or "bound" coverage, or in any other manner act(ed) as an agent or broker in the transaction of surplus lines insurance" as to the negotiations with Gotham or in communicating with Sigma.

Cadence Insurance is a resident Insurance production facility of the State Wisconsin, and holds an Intermediary License but does not have either a Surplus Lines License in Wisconsin, nor a Managing General Agent License, or a non-resident Surplus Lines License in Michigan.

Michael J. McCluskey is individually Licensed in Wisconsin as an Intermediary and as a Property and Casualty Agent and holds a Surplus Lines License. He is the Designated Responsible Party for Cadence Insurance Brokers as required in Wisconsin.  At the time of the acts complained of herein, he had a Non-Resident Producer and Surplus Lines License in Michigan.  He had successfully completed the Registered Professional Liability Underwriter program sponsored by the Professional Liability Underwriting Society and earned the RPLU designation.

Megan Belter was an Assistant Vice-President employed at Cadence at the time of the acts complained of herein. At that time, she had no Intermediary license as an Insurance Producer, having first procured same in or about Dec. 19, 2013. She held no Non-Resident Licenses in Michigan.

At the time of the acts complained of, CalSurance's Website proclaimed and represented that:

"CalSurance is a recognized leader in professional liability insurance sales, service and support.

We are an innovative and consultative organization with a focus in professional and management liability insurance. CalSurance is driven to finding custom solutions that meet our clients' needs. This focused approach combined with the talents and experience of our staff has been the foundation of our consistent growth and long term success."

"We specialize in Errors and Omissions Programs for Financial Professionals."

Cadence's Website proclaimed and represented that:

"1. To use our focus in professional liability to our customers' advantage
2. To clearly communicate the insurance products and coverage topics to our clients
3. To completely understand each of our clients' unique operations and the market they operate in
4. To have our customers and carriers enjoy doing business with us"

"Our experience spans underwriting management for one of the top and most innovative directors and officers insurance companies, in addition to managing the professional liability office for a top three wholesale brokerage house. In each role, we guided and consulted insurance agents on the best products for companies like yours. Contact us, or have your insurance agent, contact us today so we can get to work on making sure you are properly protected" ….. Michael J. McCluskey, RPLU - President".

"No professional liability policy is the same. The most expensive is not always the best, and the cheapest not always the worst. We make sure you get the best coverage at the best price.  As your broker, we will secure options from all carriers offering coverage. We will draw the best coverage possible out of each carrier. We will clearly outline the advantages and pitfalls of all offerings in a way that's easy to understand. This allows you to make an informed decision.

"Relatively speaking, there are only a small number of carriers that offer errors and omissions coverage for security broker dealers. However, the difference between what any of those given carriers cover is vast. The price you pay for your coverage is meaningless if that carrier is going to exclude claims based on your highest exposure. Several carriers exclude items like 'trade errors', transactions involving 'troubled securities', or they don't cover your 'independent contractors'. These are just a few examples of items that cause big coverage gaps.

"Cadence has identified over 90 coverage points that we feel are of concern. We work with each carrier until we have no, or only a few, coverage differences before we present the quotes to you. We know your time is valuable and that our job is to tie up all the loose ends for you so you can concentrate on your business.

"Sigma had a primary professional liability insurance policy from Arch Specialty Insurance Company ("the Arch policy"). The Arch policy provided a general coverage limit of $2 million per claim and $10 million total. The Arch policy also provided a special coverage (sub-) limit for "alternative investments" of $1 million per claim and $5 million total." (ODPMPSJ)

"Sigma sought excess coverage from its insurance agent, CalSurance. A game of telephone followed. CalSurance told Cadence that Sigma wanted $5 million in excess coverage to "fit over" the aggregate on the $2 million/$10 million general coverage limit and $1 million/$5 million alternative investments coverage limit of the Arch policy. Cadence communicated this information to Gotham." (ODPMPSJ)

"Cadence issued an insurance binder for a policy Gotham was going to issue ("the Gotham binder"). The Gotham binder didn't mention the $1 million/$5 million alternative investments coverage limit of the Arch policy. Gotham eventually issued the excess coverage policy ("the Gotham policy"). CalSurance told Sigma that CalSurance would review the Gotham policy. CalSurance then sent the Gotham policy to Sigma." (ODPMPSJ)

"Gotham refused to provide coverage, arguing that it was only obligated to do so after the Arch's policy's $2 million/$10 million general coverage limit was exhausted. Everyone agrees that the $1 million/$5 million alternative investments coverage limit was exhausted and that the $2 million/$10 million general coverage limit wasn't exhausted. Gotham cites the following language (and in particular, the bolded language) from the Gotham policy to support its position." (ODPMPSJ)

Gotham, at the time of the acts complained of, advertised this Product as:

"A Product Tailor Made for Broker-Dealers and Investment Advisers

"Scores of insurance companies offer vanilla Errors & Omissions Policies.
These standard policies tend to exclude certain risks that leave brokers-dealers and investment advisers unnecessarily exposed. Often times, they aren't even aware of the coverage gaps because they aren't working with a specialist agent who has the expertise to know and appreciate the risks that broker-dealers and investment advisers face in this ever changing marketplace.

"In partnership with specialist distributors who have unique insight into the risks broker-dealers face, ProSight Specialty  has developed custom-tailored insurance solutions addressing these risks. ...

"ProSight partners exclusively with select distributors who have a deep understanding of their customers. For this program, we work with 2 companies that have extensive experience with broker-dealers and investment advisers - Crump Insurance Services and Cadence Insurance Brokers.  Learn more about these companies or visit their website...

... Primary or Excess"

At the time Sigma needed to begin the process of renewing their coverage in 2012, they knew there would be certain risks where they would be unnecessarily exposed due to a change in the limits their expiring Carrier, Arch, was requiring for their renewal.  In essence, Arch was introducing a Sub-limit for "alternative investments" of $1 million per claim and $5 million in the aggregate.  Arch was also reducing from $15 million its aggregate general policy limit. It is uncontroverted that Sigma wanted an excess Policy that increased the aggregate limit to a total of $10 million from the new $5,000,000 sub-limit (by adding a $5 million excess layer  the "alternative investments" Aggregate Limits). The premium for the new Excess Policy was close to $300,000 dollars. Sigma spent that kind of money for the Gotham Excess Policy because it believed the excess layer would fit over all limits in the Arch policy, including the "alternative investments" sublimit. Sigma would not have knowingly paid close to $300,000 for a policy that would fit over only the $10 million general aggregate limits, creating a $5 million gap for "alternative investments" claims, as Prosight later claimed exists. Mr. Knowles at CalSurance knew this was the need and desire of his client, it was communicated to Michael McCluskey at Cadence, and was equally known to the Gotham Underwriter as admitted in her recent deposition.

The Excess Policy was issued without making it clear with uncontestable language that the intent of the Policyholder had been met.  Equally true, if it was never the intent of ProSight/Gotham to provide such a tailormade product to close a coverage gap, their intent was never communicated to their Producer.

ProSight/Gotham was aware of the fact Cadence was releasing Indications and Binders to Sigma's Agent that were prepared by Cadence on a form after sending same to ProSight for prior review. ProSight provided Cadence with the Policy number evidencing coverage was bound and later issued a policy based on the binder prepared by Cadence.

**Opinions:**

**Was the ordinary Standard of care breached?**

Traditionally, a Broker represents the policyholder. Given that Wholesalers are also licensed as a Broker, it is equally true a Wholesale Broker represents the Insured. The basic Standard of Care is to diligently obtain the coverage requested and ordered by the Customer. The Broker must also act in accordance with all laws and regulation in doing so. It is generally held there is no duty to advise nor any higher Standard of care to follow unless a Special Relationship exists or where the Insurance Producer has agreed to provide additional and specialized services.

This lawsuit arises from the fact that the coverage ordered and obtained was not as requested even though the Insured was under the impression they had in fact received what they had requested. If true, and the Trier of Fact determines the policy as issued does not provide what the Insured requested, then the brokers herein did not act or provide services consistent with the ordinary Standard of Care Brokers are obligated to follow.

The mere fact that the policy language is having to be interpreted by the Court equally demonstrates that the Brokers failed to provide a policy that meets the insured's expectations with language that is uncontestable.

**Are the Production Facilities held to a Higher Standard of Care?**

Insurance Brokers may often be required to act in accordance with the highest Standard of Care that can arise from several actions or statements. These include holding oneself out as an expert, agreeing to provide advice as may be requested, misrepresenting coverage, or having such a long term relationship that a Special Relationship is created simply due to the intimate knowledge and trust that often is the result of long term relationships.

In this case, there is no doubt that a long term relationship existed and continues to exist between CalSurance and Sigma. Equally true, CalSurance holds itself out as an expert in obtaining Broker-Dealer coverages for their Customers. In the regard, it is easy for me to conclude that indeed, a Special relationship does exist between CalSurance and Sigma giving rise to a higher standard of care. Further, as indicated above, the Duty was in fact breached. Although CalSurance was likely justified in relying on the expertise of, and representations made by, Cadence given the exclusivity they enjoyed in distributing ProSight's supposedly unique "gap filling" product, CalSurance ultimately failed to obtain for its client the policy needed and specifically requested by its client Sigma. Among other things, it failed to sufficiently confirm during the underwriting process that Gotham/ProSight intended, and the policy provided would, attach over the "alternative investments" sublimit, in addition to the general policy aggregate. The coverage Sigma intended to receive was contested by Gotham and the Court at this point in the case has found the policy did not provide the coverage Sigma requested and that CalSurance, Cadence and Gotham "erred on an important detail of the excess coverage Sigma said it wanted." CalSurance's error in this regard and by failing to obtain uncontestable coverage falls below the standard of care.

While I have concluded CalSurance did not live up to a higher Standard of Care, it is equally true that the neither did Cadence. They had actual knowledge of what was desired and not only failed to provide it, but failed to advise that the Company was not addressing their questions to verify that the excess policy was indeed excess of the sub-limits in issue. Whether such a misrepresentation was a major oversight or intentional, I will leave to the trier

of fact. Both would provide a result that would not bode well for Cadence given that the coverage requested had not been provided. Also true is the fact that Cadence, like CalSurance, holds itself out as an expert and represents that they "clearly communicate the insurance products and coverage topics to our clients" but failed to do so here.

**Did Gotham Follow Normal & Customary procedures as to how this Policy was Quoted and issued  and in Their Communications Concerning the Underwriting of the Policy**

In all of my 20 years investigating and resolving Professional Liability Claims against Insurance Production facilities inclusive of the day-to-day workings as between the Insurer and their Producer, I have never seen behavior as took place at ProSight. The same is equally true during my 22 years as an Insurance Producer which included working with Underwriters on a daily basis as a Broker, Wholesale Broker, and even as a true Managing Underwriter of Professional Lines and Employment Practice Lines of coverage.  Contributing to the apparent confusion as to what was requested versus what was provided is the following:

-Knowingly allowing Cadence to issue "indications" as if based on formal writings from the Insurer instead of simple telephone and email communications with no real details other than as provided by Cadence.

-Then acting as if what Cadence did wasn't appropriate nor binding on the Company.

-Knowingly allowing Cadence to issue a "binder" after Cadence sent the document to Catherine Jones for her review with language in it intended to communicate to the insured that the excess policy would drop down over "any" limit in the Arch policy and issuing a policy number for use in the binder. How would anyone know that the intent wasn't approved when all that is thereafter provided, is the policy number from a low level assistant?

-Then acting as if what Cadence did wasn't appropriate nor binding on the Company despite knowing in advance this would take place and no doubt was a common practice on most if not all Placements from Cadence. In recent depositions, Claims personnel from ProSight claim there is no duty on the part of the underwriter to advise Cadence their assumptions or understandings were wrong. How absurd given that Litigation exactly like this is a direct result of their silence, which is contrary to everyone's interest that is involved.  This is hardly consistent with the notion that an Underwriter is supposed to protect the Company from unnecessary Litigation or exposure, as opposed to setting the stage for that exact result.

-Permitting Cadence to issue binders to insureds that Gotham/ProSight now claim are unauthorized and failing to disclose to Cadence that Gotham/ProSight would itself issue binders for the insured if Cadence requested it, as Gotham/ProSight did with its other agent, Crump, thereby knowingly allowing Cadence to proliferate allegedly unauthorized binders for Gotham's insureds that could very well give rise to unnecessary litigation like the one at Bar. Such actions are why all States ban Unfair Trade Practices.

-By claiming that it doesn't matter nor does ProSight care what Cadence represents or sends to Cadence's clients concerning the policy because at the end of the day only the policy language determines coverage, not what Cadence represents will be covered. This is a rather astounding claim given that Gotham/ProSight represents the Broker Dealer Program as one in which "ProSight partners exclusively with select distributors who have a deep understanding of their customers, (and) has developed custom-tailored insurance solutions addressing these risks… (to supposedly avoid) certain risks that leave brokers-dealers and investment advisers unnecessarily exposed," but then ignores the efforts of their

"partner" Cadence to avoid leaving Sigma "unnecessarily exposed" by creating a gap in coverage over the
sub-limits in the primary policy.

Even more astounding are the revelations in the recently taken deposition of Catherine Jones. Therein she admits
knowing exactly what was desired by Sigma, knew she didn't intend on providing it (claiming partly she couldn't
under her guidelines), yet claims she didn't have to. She never responded or confirmed that what the Insured
intended was not what she was providing. She further testified that she didn't even see the need to make a phone
call to clarify matters. In justifying this lack of concern for a true meeting of the minds, she claims Cadence sent a
submission stating the insured was "seeking" certain excess terms but that such was not a rather than "requesting"
excess terms. I fail to see a difference, especially where over $280,000 was in in issue. I've seen $5,000 Lawyer
E&O Policies get more attention and honest communication.

I have never seen such a lack of up front, complete and honest communication especially amongst "trusted
partners". I'll leave to the Court to determine whether Unfair Trade Practices has taken place given the lack of it.
Suffice it to say that at a minimum, I am greatly troubled by it given that ProSight seems to be creating an
atmosphere where their withholding of clarity and allowing their exclusive agents with full knowledge of what
they were doing to repeatedly engage in conduct Gotham/ProSight later claims is unauthorized creates a high
probability that the insured would be misled that they were getting what they wanted and needed. By failing to
respond directly and clearly to the unambiguous request for excess coverage over the "alternative investments"
sublimit, Gotham/ProSight failed to communicate during the underwriting process important facts concerning the
Gotham excess policy. Under such circumstances, it is not surprising that the insured and its agents believed the
requested coverage had been provided and only discovered that Gotham/ProSight did not intend to provide it after
almost $300,000 was paid and claims under the policy were made.

Let us not forget too, that the ProSight/Gotham policy was a following form policy. If the Arch form was a $2
million per claim / $10 million aggregate, except for Alternative Investment claims where the policy dropped
down to a $1 million per claim/$5 million Aggregate, the Excess should follow down as well.

While not directly contributing to the lack of coverage suffered by Sigma, one other "ministerial" but required
item needs to be spotlighted. In the context of some unique and substandard behavior, this additional fact seems to
support the conclusion there is a culture of cavalier behavior of those at Gotham/ProSight. Ms. Jones has
testified she printed all of her notes taken during the underwriting process and kept them in her desk and not
saved on her computer or anywhere else. Since they are part of the Underwritng process, they are required to be
"in the official Compony file" (or Computer Management System). Thus, they can be reviewed by Staff, Senior
Management, re-insurers, and regulatory agencies. Again, this is substandard and contributes to a culture that may
be more concerned with plausible deniability than having a true and upfront meeting of the minds especially when
a coverage denial is taking place. To my knowledge, those notes have not been made available for inspection to
any of the parties in this case.

Also, in examining the ProSight Surplus Lines Disclosure form, the firm normally responsible for placing the
coverage AND filing same with the State Authorities is a person at Cadence. Most, if not all States, require that
the filing be done by those licensed to transact the placement, i.e. Cadence (or its Principal Responsible Person).
Only Cadence was in direct contact with ProSight to transact this placement and thus is responsible for the filing.
Unfortunately, the form was signed by an individual at CalSurance that had nothing to do with the transaction. As
above, CalSurance has no organizational Surplus Lines license in Michigan. The fact that ProSight accepted their
Disclosure form from someone not involved in the placement, is just another example of their cavalier approach
to how they underwrite insurance.
///

Respectfully Submitted this  Day of May, 2012

_____
Frederick J. Fisher, J.D., CCP
///

# EXHIBIT A

# Exhibit A

CURRICULUM VITAE

Frederick J. Fisher, J.D., CCP
President, Fisher Consulting Group, Inc.
President, Executive Liability Managers Insurance Services, Inc.
214 Main Street, Ste 181
El Segundo, CA 90245
310-426 2105

As of May,  2017

**EDUCATION:**

1972-1976   Lincoln University Law School
San Francisco, California
Graduated - May 1976 - J.D. Degree

1968-1972   University of California at Berkeley
Graduated June 1972,  B.A. Degree in  Social Sciences

**PROFESSIONAL AFFILIATIONS:**

Licensed property & casualty insurance adjuster (since 1979)
Licensed as a property & casualty insurance broker-agent (1978-1982, 1994-Present)
Licensed Surplus Line Broker (July 14, 1995 to Present)
Formerly licensed as a real estate agent  (1978-1982)
Certified Claims Professional (CCP)  9-2015 to Present

A Founding Member, and member of the *Board of Trustees, Professional Liability Underwriting Society (PLUS)*  (1993-1999)

*President, Professional Liability Underwriting Society (1997-1998)*

*Vice President , Professional Liability Underwriting Society (1996-1997)*

*Secretary/Treasurer of PLUS and Member of Executive Committee* (1994-1996)

*Chairman of the PLUS Budget Committee* (1994-1996)

Co-Chair, *PLUS Membership Committee* (1993-1994)

Chairman, *PLUS Communication Committee* (1996-1997)

Frederick J. Fisher
Curriculum Vitae

Member, *Professional Liability Underwriting Society (PLUS) Education Committee* (1991 to 1994), RPLU Peer Review Committee (1992 to2006), and *Southern California PLUS Steering Committee* (1992 to 2005). Member, *Subject Matter Expert Team*- RPLU Professional Liability Insurance Claims Section (Feb- April, 2007), & Real Estate Professional Liability Module

**1990- Present, Senior Technical Advisor and Quarterly Supplement Author** for The Professional Liability Manual, published by The International Risk Management Institute.

2007 – **Member, ACORD Professional Liability Specialty Lines Working Group,** a committee consulting on standardization of the Specialty Lines Applications.

December 2013 – Present  **Member- Editorial Board  Agents of America.**ORG (AOA) – Responsible for  assisting in the development and Risk Management and loss control publications for Insurance Agents & Brokers.

September 2013 – Present -**Faculty member and Member of the Executive Council, Claims College- School of Professional Lines** sponsored by the **Claims & Litigation Management Alliance.** Successful completion leads to the obtaining of the Certified Claims Professional designation(CCP). I am instructor on Professional Liability lines for Level 1, Level 2 and Level 3 Classes. I have authored or co-authored courses at each level and been a Course Instructor at each "College" since its inception in 2013. Course materials including Bad faith avoidance in each of the 3 levels.

**California Surplus Lines Contact Broker:**

| | | |
|---|---|---|
| Philadelphia Insurance Company | 1996 - 2010 | |
| Protective Specialty Insurance Company | 2010 - 2014 | |

**SUMMARY OF SIGNIFICANT INDUSTRY CONTRIBUTIONS:**

**1978-** Created Loss Control Programs for Real Estate Brokers and Insurance Brokers. Significant losses were prevented and a reduction in claims frequency was achieved. Loss Control and Best Practice(s) procedures are now considered standard operating practices with many other professions and by Corporate Boards of Directors.

**1984-** Created tight Attorney Management & Litigation Guidelines as a TPA which were  adopted by several mainline Insurers and Self-Insureds. The Guidelines also  included requirements for claim resolution plans and strategies. Guideline compliance was an included item in the Claims Auditing

Frederick J. Fisher
Curriculum Vitae

services as described below.

**1986-** Created Unique Qualitative Claim Auditing and Compliance Techniques which required review of over 50 claim management issues together with a Computer system to track and generate statistical performance reports on an overall, divisional and individual basis. Such techniques were adopted by Internal Auditing teams at several Insurers & Re-insurers and made a permanent part of the LA Rapid Transit District (RTD- now known as the MTA) RFP for Bi-Annual audits of their TPA. The initial 1986 Audit was the first time it was subsequently proven quantitatively that increasing claims staff expense so as to reduce per person case loads would result in a minimum overall total incurred savings of at least $5 to every $1 spent. Our Auditing processes and the performance issues reviewed, graded, and mirrored many of the claim handling requirements of the Fair Claim Practice Standards recommended by the National Association of Insurance Commissioners (NAIC). Most States have adopted the NAIC Model act as part of their own Fair Claim Practice regulations.

Our Training Programs were provided many Insurers on California Fair Claim Practices. When paired with our Claim Auditing services, significant claim costs savings were experienced with a drop in the frequency of Bad Faith Case filings.

Such services were provided to Homestead Insurance Company, The RTD, AIG Claim and Underwriting Units, Reliance Insurance Company, Home Insurance Company, Transamerica Re-Insurance Company (auditing the California Bar Association Professional Liability Program), San Diego Trolley System Claims Administrator, and others.

**1986** Created Unique & Proprietary Claims Tracking TPA Software using Networked P.C.'s and a relational Database every bit as statistically powerful as mainframe systems at that time.

**1994-** Contributed to killing the proposed NAIC Model Surplus Lines Act that would have made Surplus Lines Brokers financially responsible for the insolvency of Non-Admitted Insurers (a misguided response to the crisis created by phony offshore Insurers)

**1990 – Present-**Association volunteer work (PLUS) as noted above, lecturing and educational publishing as noted below.

**REAL ESTATE PROFESSIONAL LIABILITY LECTURING:**

June 1978 through 1992: Speaker at loss control seminars on preventing real estate malpractice. Speaker at local board of realtors' seminars on preventing real estate malpractice of the following boards:

San Francisco Board of Realtors
Los Angeles Board of Realtors

Frederick J. Fisher
Curriculum Vitae
Page 4

    Anaheim Board of Realtors
    La Jolla Board of Realtors
    Newport Board of Realtors
    Camarillo Board of Realtors
    East Orange Board of Realtors
    South Orange Board of Realtors
    West Orange Board of Realtors
    San Diego Board of Realtors
    San Fernando Board of Realtors
    Costa Mesa Board of Realtors
    Los Angeles Region of Century 21
    Orange County Region of Century 21
    San Diego Region of Century 21
    Seminar sponsored by Cal Land Title
    Seminar sponsored by Tile Insurance and Trust Company
    In-house seminar sponsored by Van Vleck Realtors
    Cal Pacific Realty and Gribon Von Dyl Realty
    Faculty member for Northwest Center for Professional Education on environmental
    liability in real estate
    Video Professor for Lumbleau School of Real Estate
        "Preventing Realtor Malpractice"

**PROFESSIONAL LECTURING ON INSURANCE MATTERS**

Speaker on preventing insurance agents and brokers' liability to:

    Western Association of Insurance Brokers
    Agents Alliance Conventions for 1979, 1980, 1981, 1982, 1984,
        1985,1987, 1989, 1991,  1992,  1993, 1994 & 1997
    Los Angeles and Orange County CPCU Chapters
    Long Beach CPCU Chapter
    Independent Insurance Agents Associations of
    San Fernando Valley, Los Angeles, South Bay and Big "I" Day for the IIAA of Los Angeles,
        Inland Empire and Orange County

May 17, 2017 – Author of and Co-Speaker with Sally Combs- **CLM Webinar- The Dangers that
May Lurk in Claims Made Policies-** A Webinar for Claims Personnel and Defense lawyers dealing
on the Claims issues that arise with Policy Language that may create more problems than anticipated.

Frederick J. Fisher
Curriculum Vitae

April 18 & 19th, 2017 - **Insurance Fraud Today- and What the Future May Hold.** A 3 Hour CE Course sponsored by the California Surplus Lines Association in Los angles and San Francisco- Co- presented and Co-authored by Michael Wagner of the W Group.

June 23, 2016- CLE Seminar Presentation to Ervin, Cohen & Jessup, LLP, Beverly Hills, Ca. on **The Dangers that Lurk, Common Gotchya's in Professional Liability Coverage forms.,** and their implications for Bad Faith denials of Coverage.

June 10, 2016, (and repeated on Oct 19, 2016 in Dallas, Tx) Speaker and CE Presenter at the National Alliance for Insurance Education & Research, James K. Ruble MEGA Seminar- **Insuring Emerging Trends: The Internet of Things and other Technologies**

July 2015- Dec 2015- Webinar presenter for Audio Solutions, LLC.   I was retained to present Webinars on entitled **"What Every Broker needs to Know about D&O"** (07-15-2015), Do You Know EPLI ? (08-13-2015),  **"To advise or Not To advise, What you need to know to Avoid an E&O Claim"** (10-28-2015); and **"Insurance 101 for New Attorneys"** (Dec. 18, 2018).

Sept. 10-12, 2015- Faculty Member & Presenter, School of Professional Lines of the Claims & Litigation Management Association:  Level 2 Course on <u>**Reducing Overall Claims Costs - Proven Strategies**</u> , Level 3 Advanced Course on **Independent Counsel- Knowing, When and How to work with Them,**  (and avoiding Bad Faith),  Author  of and Oral Examination Grader- **Level 3 Certification.**

Aug. 11,  2015:  Author and Sr. Panelist Webinar,  "Insurance 101 for new Attorneys (and others too), **sponsored by the Claims & Litigation Management  Alliance.** The Course included a lengthy discussion and analysis of the potential for Bad Faith that can arise from Diminishing Limit policies.

July 15,  2015 : **Instructor for  <u>"What every Agent Needs to know about Current  D&O developments"</u>** Webinar sponsored by Audio Solutions

June 4, 2015: Panelist and Presenter on **"Merger and Acquisitions in the Medical Industry after ACA"** sponsored by the Claim & Litigation Management association at their annual Professional Liability Conference– Chicago.

Mar. 27, 2015- Panelist for the Calif. Assoc. of Residential Property Managers –**Risk Management and E&O Insurance Issues**

Mar. 17 & 18, 2015  **BOX—WHAT BOX? THINKING BEYOND THE SAME,** a CE Seminar Co-Presented with Louis Castoria, Esq., Sponsored by the Calif. Surplus Lines Association

Frederick J. Fisher
Curriculum Vitae

January 20, 2015- Massachusetts Banking Association- Webinar Instructor on **Cyber Liability**

Sept. 29, 2014, **"The Industry in a 60 Minute Nutshell "** presented to Students at Cal State University, Center for Insurance Studies

Sept 25, 2014 Insurance Journal/Academy of Insurance Webinar Instructor on **"Flirting with Disaster- Misunderstanding Employment Practice Liability"**

Sept. 9, 2014   Faculty Member, School of Professional Lines of the   Claims & Litigation Management Association: <u>**Reducing Overall Claims Costs - Proven Strategies,** and avoiding Bad Faith when doing so.</u>

Aug 6, 2014- Insurance Journal/Academy of Insurance Webinar Instructor on **"Comparing D & O Forms: What to Look for; Ask for and Run Screaming From"**

July 15, 2014 –Webinar Panelist on Escrow Co Liability and E&O- Cyber Insurance need,

Jun 23, 2104 Panelist on <u>**"Evolution of EPLI Policies",**</u> sponsored by the American Conference Institute.- Chicago Il.

May 20 & 21, 2014- (Los Angeles & San Francisco) Co-Instructor with Louis Castoria Esq. for CE Seminars presented by the California Surplus Lines Association entitled **Specialty Lines Claims- The Profit Center of the Industry, and** how Bad Faith creates Underwriting Losses

Feb. 7, 2014 - Seminar on **Insurance Basics for Defense Lawyers,** potential for Bad Faith that can arise from Diminishing Limit policies,  sponsored by Collins, Collins, Muir & Stewart, Pasadena office- Streamed to Branch Offices, potential for Bad Faith that can arise from Diminishing Limit policies.

Sept 9, 2013, Faculty Member, Professional Lines College at the inaugural Claims College sponsored by the Claims & Litigation Management Association: **"Coordinating the Process", and avoiding Bad Faith.**

June 2, 2013- Panelist on <u>**"Evolution of EPLI Policies",**</u> sponsored by the American Conference Institute.

May 23, 2013- Instructor for <u>**"What Every Agent Needs to Know about Cyber Liability**</u>*"* Webinar sponsored by the Academy of Insurance

Frederick J. Fisher
Curriculum Vitae

February 26, 2013- PLUS Webinar Presenter and Panel Member- **"E&O Insurance Profits via Proper Coverage, Good Service and avoiding Bad Faith"**

Dec. 5, 2012, Instructor for **"What to Expect from Specialty Lines Claims"** Webinar sponsored by the Academy of Insurance- including discussions on the importance of avoiding Bad Faith.

Sept. 5, 2012 – CE Course delivered to the Insurance Professionals of Orange County- **"The Dangers Lurking in Claims Made Insurance Policies, nad how Bad Faith can result"**

March 1, 2012- Instructor for **"What Every Agent Needs to Know about Cyber Liability"** Webinar sponsored by the Academy of Insurance

Nov 9, 2011, Instructor for **"What to Expect from Specialty Lines Claims, and the Threat to Profitability arising from Bad Faith"** Webinar sponsored by the Academy of Insurance.

January 28, 2011, **CLE Seminar on Insurance Basics for Defense Lawyers** sponsored by Tressler, LLP

October 28, 2010, Instructor for **"What every Agent Needs to know about Fiduciary Liability"** Webinar sponsored by the Academy of Insurance

October 14, 2010, and updated, August 18, 2011, Instructor for **"What every Agent Needs to know about EPLI"** Webinar sponsored by the Academy of Insurance.

October 7, 2010, and updated, August 11, 2011, Instructor for **"What every Agent Needs to know about D&O"** Webinar sponsored by the Academy of Insurance.

Aug. 18, 2010 Webinar Speaker and CLE Program Lecturer on **The Evolution of Claims-Made Insurance and Current Their Current Developments, potential for Bad Faith that can arise from Diminishing Limit policies**, sponsored by the Los Angeles office of Wilson, Elser et al. and broadcast to other offices.

May 4, 2010 CLE Seminar on **Insurance Basics for Defense Lawyers,** potential for Bad Faith that can arise from  Diminishing Limit policies,  sponsored by Wilson, Elser et al.

April 02, 2010, CLE Seminar on **Insurance Basics for Defense Lawyers** sponsored by Collins,

7 | Page

Frederick J. Fisher
Curriculum Vitae

Collins, Muir & Stewart

Jan. 13, 2010 Webinar Speaker and CLE Program on Claims-Made Insurance: *Defending Against Late Notice Claims and Preserving Coverage* sponsored by Strafford Publications.

Sept. 14, 2009 – Speaker at the International Re-Insurance Underwriters Association Mid Year Conference- *Current Trends in Financial Services D&O from a Broker and Claims Perspective*

Mar. 2007 - Seminar on **Insurance Basics for Defense Lawyers** sponsored by Hinshaw & Culbertson, Los Angeles Office.

Jan 19, 2005 - So. Calif. Chapter of PLUS- Speaker on *"Introduction to Professional Liability"*

Aug 18, 2004- So. Calif. Chapter of PLUS- Speaker on *Insuring Architects & Engineers*

April, 2003- Moderator and Speaker at PLUS E&O Symposium- Phila, Pa on *"Claims made Conundrum- the meaning of Continuity dates"*

**May 2001- Current- California Approved Continuing Education Instructor on Miscellaneous Liability, Insuring Employment Practice Liability, Cyberspace Liability, Media Liability and Directors & Officers Liability (Provider # 48379)**

April, 2000- Moderator and Speaker on Insuring Multiple Disciplined Professions- Sponsored by the Southern California Chapter of PLUS

**Nov- Dec 1999- Instructor- College of Insurance- RPLU Part V- D&O and EPLI, the Potential for Bad Faith arising from ambiguous policy forms.**

Aug 21, 1997, moderator and Speaker at Western Regional PLUS sponsored event on Cyberspace Liability Insurance and exposures.

March 14, 1996, moderator and Speaker at So. California Chapter of PLUS sponsored event on Employment Practice Liability Insurance, Intentional Acts Coverage issues in Insurance Policies.

February 27, 1996, Speaker and Moderator on A *Cyberspace Liability and Insurance Issues of the Internet*, sponsored by the Southern California Software Council.

August 17, 1995, Program Co-Chair for *PLUS Day,* sponsored by the S. California Chapter, *PLUS.* Speaker on *Introduction to Claims Made Policy forms and Standard Lines of Professional Liability.*

Frederick J. Fisher
Curriculum Vitae


Nov. 1994- Moderator and Speaker for Loss Control, *PLUS National Conference*

Aug. 1994- Moderator and Speaker for Current Legal Trends in Claims Made Policies, *PLUS Day*
Sponsored by the Southern California Chapter of PLUS

Aug. 1993- Moderator and Speaker for Current Legal Trends in Professional Liability, *PLUS Day*
Sponsored by the Southern California Chapter of PLUS

1986- Lecturer on insurance agents and brokers' liabilities pursuant to the new CGL claims-made
policy and its significant potential for Bad Faith  given to IIAA's of: Santa Barbara, Ventura, San
Fernando Valley, Los Angeles, South Bay and Long Beach.

1986- Sept- Seminar on **Insurance Basics for Defense Lawyers** sponsored by Kirtland & Packard

Speaker at PLUS meeting on claims-made underwriting problems in professional liability

1986 Speaker on agents and brokers' liabilities under the new CGL policy for Big "I" Day sponsored
by the IIAA of Los Angeles, Inland Empire and Orange County.

1986 Lecturer on new CGL policy for American Agents Alliance and Harbor Insurance Co.

1986 Publisher of:  "The New ISO Forms, A Golden Road to Disaster".
Under contract with Prentice Hall to author book on insurance agents liability.

Speaker at Environmental Liability Seminars for the insurance industry.

1984-1987 **Claims training, Litigation Management and Bad Faith Risk Prevention** seminars
given to Crum & Forster, American International Group, American International Adjusting
Company, Equity General Agents, Lancer Insurance Company, Argonaut Insurance Company,
Homestead Insurance Company and General Star Management.


**PUBLISHED ARTICLES:**

Feb. 27, 2017 as Vol 9, Issue 1, Winter, 2017 issue of  **Professional Liability Defense Quarterly,**
sponsored by  the **Professional Liability Defense Federation,** article eco-authored with Louie
Castoria, Esq., entitled **Working with Expert Witnesses: Tips that are not in the Civil Rules.**

Frederick J. Fisher
Curriculum Vitae

Aug. 4, 2015 (re-run Aug. 5 in Insurance Journal):  **A Different Take on Insurance Price Optimization,** published on line by Carrier Management, an Insurance Journal Publication (4th most read article that week)

June 2, 2010 – June 15, 2010- 3 part series entitled ***Current Trends - The Unintended Results of the Absolute Exclusion*** Published in *MyNewMarkets.com* E-Newsletter Sponsored by the *Insurance Journal*

Mar 23- April 3, 2009-Five part Claims Made Series : ***The History of the Claims Made Form and it's Current Problems***- Published in *MyNewMarkets.com* E-Newsletter Sponsored by the *Insurance Journal* and Re-Run for a second time February 8, 2010 – February 19, 2010,  an Insurance Journal first. This re-run served as the basis for on an Insurance Journal February 25, 2010 Webinar on the differences between occurrence and claims made coverage forms.  This series was also the 8th most read Insurance Journal on-line article of 2009.  **Republished** in the **PLUS Blog,** November, 2014

July, 2005 The Professional Liability Manual Quarterly Update  - **CONTINUITY AND PRIOR/PENDING LITIGATION EXCLUSIONS IN THE CLAIMS-MADE POLICY FORM**

October 25, 2004- *Insurance Journal*- Author of article on ***Professional Liability: Will the Cycle Remain Unbroken***

Nov. 1, 1999- *Insurance Week*- Author of article on Multiple Professions, Multiple (and Challenging) Liability Exposures

Feb. 15, 1999- *Insurance Week*- Arthur of Article "Y2K Readiness: An Equation with Many Variables

Nov. 10, 1997, *Insurance Journal* – Co-Arthur of Article on "A Look at the Ever-Changing Professional Liability Marketplace

Nov. 10, 1997, *Insurance Week*-  Author of Article on Standardization of EPLI Insurance

May, 1996, *The Professional Liability Manual,* Recent Discoveries in  Medical Malpractice Risk Management published by the International Risk Management Institute, an article on new exposures arising from Latex Allergies and its potential impact on Malpractice and ADA Claims, republished by *PLUS New & Views*.

February, 1996, ***The Professional Liability Manual, Technocratic Liability*** published by the

Frederick J. Fisher
Curriculum Vitae

International Risk Management Institute, an article on claims exposures arising from Internet Providers and users.

February 12, 1996, *Insurance Week*, Cyberspace is Filled with New Exposures, Coverage Needs≅, an article analyzing special problems in underwriting Computer Consultants and other professional liability risks involved with the Internet.

Nov.13, 1995, *Insurance Week*, Miscellaneous Professional Liability Risks, an article analyzing special problems in selling and underwriting miscellaneous professional liability accounts.

Aug., 21, 1995, *Insurance Journal*, Agent & Broker Obligations are Part of the Law≅, an article re-exploring Agent & Broker ethical obligations.

January, 1995, *Professional Liability Manual*, Technical Aspects of Professional Liability Claims, an 18 page article for the Practical Concerns section analyzing the techniques to successful E & O claims handling and coverage analysis.

November, 1994, *News and Views, PLUS Newsletter*, "Problems with Diminishing Limit Policies", explaining claim problems and the **Bad Faith** potential inherent with diminishing limit insurance Policies, Reprinted as quarterly supplement in the *Professional Liability Manual.*

October 31, 1994, *Insurance Journal*, "Reduce E & O Claim Loss Through Outsourcing", an article on delivering Loss Control benefits at the local level in conjunction with E & O Insurance to reduce Claim frequency.

May 2, 1994, *Insurance Week,* Due Diligence, "How to Read a Financial Statement", an article explaining the basics of reading and understanding an Insurance Company's financial statement in order to complete a Broker's due diligence obligation.

Jan. 24, 1994, *The Insurance Journal,* "Agent & Broker E & O", an article on Agent & Broker E & O claims and ways to prevent them in the future.

July 5, 1993, *The Insurance Journal,* "Pre-Underwriting Professional Liability", an article detailing ways in which to going beyond reviewing the hazard of a professional by also designing an application that reviews the risk of a claim being first made during the applied for policy term. Republished in the PLUS Monthly Newsletter, National Conference Issue, November, 1993.

April 12, 1993, *The Insurance Journal,* "The End of the California Market", an article on the current state of Insurance in California as a result of Offshore insurance scams and new legislation to

Frederick J. Fisher
Curriculum Vitae

combat it.

Nov, 1992 - February, 1993,  various letters to the editor in Trade publications in. re. offshore insurance Scams and how it is affecting California.

July 1992 - September, 1992-  various appearances testifying at State Legislative Committee hearings investigating the impact of offshore insurance scams.

July, 1992 - January, 1993-  5 appearances on various news related television stories focusing on offshore insurance scams.

May/June 1992, **PLUS Newsletter**- Author of "Reducing Traditional Loss Development in Professional Liability", an article on how effective claims management and initial investigation can reduce IBNR's. Republished August 1992, **Professional Liability Manual** quarterly supplement.

February 1992, **Risk Financing** - Author of Chapter supplement entitled  "An Informational Approach to Risk Management Information Systems Design" as published by The International Risk Management Institute, Inc.

December 1991, **Construction Risk Management Administration** - Author of chapter supplement entitled "Claim Auditing" as published by The International Risk Management Institute, Inc., republished in August, 1992 in **The Workers Compensation Guide**.

December 1990, **Professional Liability Manual** - Senior Technical Advisor for The International Risk Management Institute on a 1,000-page technical reference manual on professional liability insurance, coverage triggers, Bad Faith Exposures and professional liability exposures.  This technical manual covers professional liability exposures for a multitude of professions: from architects and engineers and accountants through zoologists.

July 1990, **The Risk Reporter** - Author of article titled "Claims-Made Insurance Triggers", published by The International Risk Management Institute.

August 17, 1986, **The Los Angeles Times** Real Estate Section - featured in article on "Realtors Learn How to Avoid Litigation"

August 1986, **The New York Times** - quoted in article on real estate agent and broker liabilities

June 16, 1986, **The Los Angeles Daily Journal** - a review of "The New ISO Forms: A Golden Road to Disaster"

Frederick J. Fisher
Curriculum Vitae


February 21, 1986, **The National Underwriter** - "ISO's Claims-Made CGL Policy: Three of its Major Problems and potential for Bad Faith"

February 1986, **Independent Agents Magazine** - featured in article on agent and broker liability as well as Insurer Bad Faith due to new CGL forms.

August 1985, **"The New ISO Forms, A Golden Road to Disaster"**, a Fisher Associates' treatise on the New ISO Forms with its Bad Faith Potential.

March 1981, **Broker Magazine** - "Preventing Insurance Agents and Brokers Malpractice"

January 5, 1981, **Business Insurance** - "Creating Litigation"

November, 1980, **Insurance Adjuster Magazine** - "The Early Settlement Dilemma"

August, 1980 - **Insurance Adjuster Magazine** - "Royal Globe Aftermath- Its Bad Faith Potential"

July 16, 1980, **Business Insurance** - "Insurance Agent and Broker Liability"

June 23, 1980, **Business Insurance** - Published article on settling multiple defendant litigation/comparative negligence

February 4, 1980, **Business Insurance** - "Risk Manager's Guide to California Liability"

November 12, 1979, **Business Insurance** - interviewed in follow-up article on Royal Globe vs. Superior Court.

September 17, 1979, **Business Insurance** - Author of article on duty of self-insured to an excess carrier to settle a claim within self- insured retention or its Bad Faith implications.

May 14, 1979, **Business Insurance** - Author of article on "Royal Globe vs. Superior Court - Bad Faith"

April 16, 1979, **Business Insurance** - Author of article on "Preventing Insurance Agents Errors and Omissions"

December 25, 1978, **Business Insurance** - Featured an article on new real estate franchise errors and omissions.

Frederick J. Fisher
Curriculum Vitae

March 10, 1978, **The National Underwriter** - "Handling Insurance Agents Errors and Omissions
Claims"

Author of Errors & Omissions Loss Control Kit for real estate brokers.

Author of 1980 Prentice-Hall book: **"BROKER BEWARE: Selling Real Estate Within the Law"**

## EMPLOYMENT HISTORY

12-19-2016-Present        President, Executive Liability Managers Insurance Service, Inc.
                         400 Continental Blvd, 6th Floor, #151
                         El Segundo, CA 90245
                         310-426 2105

12-10-2010- Present       President of Fisher Consulting Group, Inc.
                         400 Continental Blvd, 6th Floor, #151
                         El Segundo, CA 90245
                         310-426 2105

10-27-2014- Dec. 9, 2014  Director of Professional Liability  USG Insurance Services
                         400 Continental Blvd, 6th Floor, #151
                         El Segundo, CA 90245
                         724/754-9003

12-15-2010 to 08- 6- 2014  Sr. Vice President E.L.M. Insurance Brokers, Inc,

8-94 to 12-15-2010:       President and or CEO- E.L.M. Insurance Brokers, Inc. (12-31-2001)
                         Frederick John Fisher Insurance Broker (8-94 to Dec 31, 2001)
                         1960 East Grand Ave, Ste 370
                         El Segundo, California   90245
                         310/322-1301

The Brokerage firm is a proprietorship specializing in the Wholesale placement of Professional
Liability Insurance. Responsibilities include all usual and customary responsibilities consistent with
managing, staffing and operating a Brokerage Facility.  These include but are not limited to direct
responsibility for development of new company products and services, automation of internal

Frederick J. Fisher
Curriculum Vitae

company systems, and supervision of staff.  Also, reviewed and implemented administrative procedures and systems in order to facilitate smooth company operations as well as developing and managing my own book of business.

1982-1995      Surplus Risk Services, Inc., dba The Fisher Associates, Adjusters.

President and principle stockholder of the corporation.  The company was licensed as  claim adjusters, conducting claims investigation, Substantive Claims Auditing and Claims Management and Fair Claims Practice Training for large insurance companies and Self Insured Companies throughout the United States and Canada.  Our Claims Auditing techniques were adopted by AIG, The RTD (Now known as the MTA), and others.  Similarly, our Attorney Management Guidelines were also used by these same organizations as a basis for their own. We also developed our in-house Claims Management System.

I was also responsible for all management and marketing duties consistent with those of the presidency of the corporation, financial responsibilities, management, supervision and training of all personnel.   Directly responsible for development of new company production and services, automation of internal company systems, and supervision of staff.  Also, reviewed and implemented administrative procedures and systems in order to facilitate smooth company operations.  The active investigation of large exposure claims is also part of the responsibilities.

1976 to 1982:        Miller & Gilbert, Incorporated
                     5822 Uplander Way, Suite 102
                     Culver City, California 90304
                         (213) 670-5015

As Vice President and owner of one third of all outstanding stock, my responsibilities include the hiring and supervision of all company employees, company marketing and acquiring new accounts. These include the placing of news items in various trade journals, issuing of press releases, author of articles for company publicity, supervision and training of all company personnel and staff.  This includes the training of staff in the handling of insurance liability claims, self insurance administration and risk management services.

I was personally responsible for expanding the scope of Miller  & Gilbert services beyond just professional liability and product liability adjusting which included the providing of risk management services, self insurance administration, underwriting consulting, and marketing consulting to insurance company clients.  I was also responsible for producing new insurance

Frederick J. Fisher
Curriculum Vitae

company clients for the handling of their claims.

1978 to 1982:          Zillgitt & Wright Insurance Brokers
                       330 Washington Street
                       Marina Del Rey, CA 90291

Part-time producer and consultant for Real Estate franchise Error & Omission Program for seven National Franchise Organizations.

1975 to 1976:          Miller & Gilbert, Incorporated
                       4340 Redwood Highway, Suite 238
                       San Rafael, California   94903
                       (415) 499-8444

Responsible for Paralegal litigation analysis and errors and omissions claims adjusting. Specialties included attorney, real estate broker, insurance broker and medical malpractice as well as product liability and BI claims.  Responsibilities included investigating and adjusting these claims for numerous client insurance companies, as well as negotiating settlement with claimant's attorneys.  I also authored the company training manual.

1974 to 1975:          Ericksen, Ericksen, Lynch, Mackenroth
                       & Arbuthnot, Incorporated
                       5 Jack London Square
                       Oakland, California
                            (415) 835-8376

Law Clerk for William Morton, Esquire.  Responsible for research, drafting motions and pleadings, handling and recommending discovery pursuant to insurance defense litigation and Bad Faith Defense.

1973 to 1974:          Law Offices of L. F. Haeberle III
                       216 Pine Street
                       San Francisco, California 94111
                       (415) 421-6475

Law Clerk for office attorneys.  Law offices were house counsel for Liberty Mutual Insurance Company. I Was responsible for research, drafting motions and pleadings, handling and

Frederick J. Fisher
Curriculum Vitae

recommending discovery pursuant to insurance defense litigation Bad Faith Defense.

1972 to 1973:        Mutual of New York Insurance Company
                     San Rafael, California

Salesman for life, health, and disability insurance during the evening hours, and the reason for leaving was not only better opportunities, but the work conflicted with my attending law school.

Frederick Fisher
Expert Witness Experience Exhibit

| CASE NAME | ISSUE | Status | TYPE OF WORK/DATE | EXPERT FOR | LAW FIRM / ATTORNEY | Counsel's Location |
|---|---|---|---|---|---|---|
| Williams vs Robert Driver Insurance et al | Insurance broker errors & omissions | C | Deposition & Trial Testimony March 2007 | Defendant | Hinshaw & Culbertson LLP | Los Angeles, CA |
| Ahmed v Costaz Ins Agency | Insurance broker errors & Bad faith claims handling | C | 10/1/2007- Trial- Defense Verdict | Defendant | Jampol Zimet | Los Angeles, CA |
| P & E vs Willis / Chubb et all | | C | Deposition Testimony, Dec. 2007 | Plaintiff | RONAN & FIRESTONE, PLC | Scottsdale, AZ 85260 |
| Safeco vs County Line | Insurance Adjuster errors & omissions | C | Deposition & Trial Testimony, March 2009 | Plaintiff | Chirye Uwechue-Akpati | Encino, CA |
| Kovac Media Group | Accountants & Consultants Error & Omission | C | Deposition, November 2009 | Plaintiff | MILLER BARONDESS, LLP | Los Angeles |
| Haynes et. al v Certain Underwriters at Lloyds | Insurer Bad Faith | C | Deposition, March 2010 | Defendant | HANSON PETERS NYE | Barrinton, Ill |
| RACHAL, vs COLONY INSURANCE | Insurance broker errors & omissions | C | Deposition, Trial Oct., 2010, Verdict well below | Defendant | Skane & Wilcox | San Diego, CA |
| GENSAR SALEIGH AND CAPITOL FINANCIAL SERVICES vs C.M. MEIERS COMPANY, INC | Breach of Contract- Insurance Broker Book of Business issue | C | Testimony at binding Arbitration, October 2010- Plaintiff Verdict | Plaintiff | STONE ROSENBLATT CHA, A PLC | Woodland Hills, Ca |
| OCS V Meinand | Insurance Broker Error & Omission | C | Deposition Testimony, 2-28-12 | Plaintiff | Carlson Law Corp | Woodland Hills, Ca |
| QUANTA INDEMNITY COMPANY v BUILDERS AND TRADESMEN'S INSURANCE | Shared Loss Dispute- Breach of Contract | C | One of 3 Mediators, April 2011 | Neutral | N/A | N/A |
| Hoyt Roofs v Century Surety Company | Insurance broker errors & omissions | C | Deposition, March 2012 | Defendant | Jampol & Zimit | Los Angeles |
| MF Nut Co., LLC aka Mac Farms of Hawai'i, LLC vs. Continental Casualty Company | Insurer Standard of Care in Handling Claims (EPLI) | C | Written report, August 2012 | Plaintiff | Tom Petrus & Miller, LLLC | Honolulu, HI |
| ECOLITE CONCRETE USA INC VS. GS LEVINE INSURANCE SERVICES | Insurance broker errors & omissions | C | Deposition, December, 2012 | Defendant | PETTIT, KOHN, INGRASSIA & LUTZ | San Diego, CA |
| Companion Property Casualty Group, a South Carolina Corporation, vs Consolidated Agency Partners dba Meninacci Insurance Associates | Insurance broker errors & omissions | C | Written Report, May 2013 | Defendant | Wilson Elser Moskowitz Edelman & Dicker LLP | Los Angeles, CA |
| Saddleback Inn vs Certain Underwriters at Lloyds et al | Insurance broker errors & omissions | C | Deposition, October, 2013 | Defendant | Soltman, Levitt, Flaherty & Wattles LLP | Westlake Village, CA |
| Wondrieu v North River et al | Insurance broker errors & omissions | C | Deposition, November 2013 | Defendant | Jampol & Zimit | Los Angeles, CA |
| Melius v Underwriters at Lloyds, et al | Insurance Company Bad Faith and Underwriting Issues | C | Written Report, January 2014, Trial Expert- Settled before trial for less than Costs of Trial | Defendant | Wilson Elser Moskowitz Edelman & Dicker LLP | Las Vegas, NV |
| Cheema v Farmers Ins. & Tania Lane et al | Insurance broker errors & omissions | C | Deposition, Trial, May 2014- Defense Verdict | Defendant | Jampol & Zimit | Los Angeles, CA |
| Boyadjieff v Farmers- Boyd insurance | Ins Broker E&O | C | Settled after Declaration provided | Plaintiff | Law Offices of Thomas R. Nigro | Irvine, Ca |
| Admiral Insurance Co v GETUSA / James River Ins.Co. | Insurance broker errors & omissions, Underwriting Issues and Standard of Care, duty to Disclose facts or Circumstances | C | Deposition, Dec 2014, Trial May 2015, Plaintiff Verdict | Plaintiff | MARRONE, ROBINSON, FREDERICK & FOSTER | Burbank, CA |
| Petrosyan v. Gazaian, Pro-one Insurance | Insurance Broker E&O | C | Deposition Jan, 2015, Settled for significant amount | Plaintiff | Wolk & Levine, LLP | Glendale, Ca |
| Passageways v Markel et al | Insurance Broker E&O | C | Trial- January 2015-settled during Trial | Defendant | Morris, Polich & Purdy | Los Angeles, CA |
| Arellano vs. Panamericana Insurance, LLC et.al. | Insurance Broker Licensing Compliance | C | Settled after expert Disclosure, June 2015 | Defendant | Matthew L. Eanet, Esq. P.C. and Ogletree, Deakins, Nash, Smoak & Stewart, P.C. | Los Angeles, CA |
| Fulton v Granite States Ins Co et. al. | Ins Broker E&O | C | Deposition, July 2015, Trial testimony Dec., 2015 | Plaintiff | Sherroff, Bidart, Echeverria, Bentley, LLP | Los Angeles, CA |

| Case | Topic | C/O | Description | Role | Firm | Location |
|---|---|---|---|---|---|---|
| Hedron v. Zurich Ins Co | Bad Faith | C | Consultant, Trial Expert- Settled before trial | Plaintiff | GREENE BROLLET & WHEELER, LLP | Santa Barbara |
| Shankar v Chu et al | Claims Made Coverage issues | C | Consultant | Defendant | Law offices of MOON & YANG, APC | Los Angeles, Ca |
| Fresh Foods Concepts Inc et al v. Zent Insurance | Insurance Broker E&O | C | Settled after my Declaration submitted in opposition to MSJ | Plaintiff | Afield Grivakes Zucker LLP | Los Angeles, CA |
| Fulton v Gennie States Ins Co et. al. | Ins. Broker E&O | O | Trial- Dec 2015- Plaintiff Verdict | Plaintiff | Shernoff, Bidart et al | Claremont, Ca |
| Aloha Ins v Smith et al | Ins Broker Trade-Secrets | O | Report Submitted, Awaiting Trial | Plaintiff | David Azapo, Esq. | Kailua-Kona, Hawaii |
| Vasilemo v Heather Olson | Ins Broker E&O9 - Certificates of Ins | C | Deposed 02-2016 | Defendant | Jampol & Zimit | Los Angeles, CA |
| People v Gustavo Ungo | Insurance Claim Fraud | C | Consultant on claims Procedures | Defendant | Law Offices of Rich Beada | Santa Monica, Ca |
| QBE v Uppa et al | Ins Broker Standard of Care | C | Written Report | Defendant | WINGERT SPADAFORA & SCHWARTZBERG, LLP | Los Angeles, CA |
| Brambla v. Wozercraft | Ins. Broker E&O | C | Deposed | Defendant | Jampol & Zimit | Los Angeles, CA |
| Epoch Insurance et. al V Phillips and AFP et al | Ins Broker Trade-Secrets | C | Deposed, Settled | Plaintiff | Carlile Patchen & Murphy LLP | Columbus, Oh |
| AmTrust North america, Incv Safebuiltinsurance Services et. al. | MGA Standard ofCare, Broker fee | O | Federal Court Expert Report submitted, Deposed awaiting Trial | Defendant | HARRIS BEACH | New York, New York |
| Skodive, LLC v Nautilus Ins Co et al | Ins Broker Standard of care | C | Declaration, won MSJ-Settled | Plaintiff | WINGERT GREBING BRUBAKER & JUSKIE LLP | San Diego, CA |
| Del Rayo Estates Hoeowners v LaBarre Oksnee Inurance | Ins. Broker Standard of Care | O | Consulting - Early Stage of Case | Defendant | | San Diego, CA |
| Aardema v Imperium Ins Co | Bad faith claims handling | C | Federal Court Report Submitted, Settled thereafter | Plaintiff | Liedle, Larson, Udt & Vail, LLP / LAW OFFICE OF MIELOS VARGA | Silver Lakes, CA |
| Vista Freight et al v. Right Step Insurnace | Ins.Broker E&O, Broker Fees | O | In Mediation | Plaintiff | CHEN, HORWITZ & FRANKLIN | Los Angeles, CA |
| Wimms v Amertitle | Escrow E&O | C | Trial, PI Verdict $1.1 mm Trebled + $750K Punitive | Plaintiff | Hostetler Law Group, LLP | Enterprise, Ore. |
| Monica Investments v 1st Century Insurance et. al | Ins Broker Standard of care | C | Settled | Plaintiff | **Soltman, Levitt, Flaherty & Wattles** | Thousand Oaks, Ca |

**Exhibit B**
**List of Documents Reviewed**

ProSight Agency Agreement with Cadence GIC-SIGMA_008012 – 008021
Arch Insurance Policy, ARCH_00093- 00132
ProSight Specialty Insurance Policy,  SFC031959 – 031972
Email- Knowles to McCluskey   SFC000040- 000043
File Materials  GIC-SIGMA_000728 – 000799
Prgm OverView  GIC-SIGMA 008508- 008509
Second Amended Complaint with Exhibits 1- 16
Rough deposition Transcript of Catherine Jones
Submission to Cadence-Arch Binder SFC 000040-0043
GIC-Sigma 000269-000706
Indication- Prosight to Cadence GIC-SIGMA_000706 -000714
Internal CalSurance Indication BB005032-5040
Exhibit Kush 018  Revised Indication BB003127-3133
Exhibit Kush 019 Knowles Bind Order with Confirmation Req as to Limits  CIB3805
Exhibit Kush 020 Req for Conditions - SL Confirmation from CalSurance BB003134- 3136
Exhibit Kush 021 SL Form- Non Res Licensee CIB003807 & CIB003806
Exhibit Kush 022 Cadence prepared Binder CIB 003802-3804
Exhibit Kush 023 Prosight Pol Number- fills in Cad Prepared Binder CIB003808-3810
Exhibit Kush 024 Cadence Binder to Cal-Surance CIB 3813-3815
Exhibit Kush 026  Policy trasmttal- PrS to Cad GIC-SIGMA_ 000882 - 00897
Exhibit Kush 032  Claims Transmittal GIC-SIGMA_004671- 004672
Exhibit Kush 033  Knowles to Prosight -  Limits confirmation BB012896
Exhibit Kush 036  Coverage letter to Sigma
Exhibit KUSH 44 Prosight Letter to Lancer re Sigma Claims
Exhibit KUSH 059 McCluskey to ProSight claims
Exhibit KUSH 061 McCluskey followup
2468_001  Program Overview GIC-SIGMA 008508- 008509
BB012770 McCluskey acks Bindorder
BB012784 Non Admitted Ins Acknowledgement
Dckt #47-1 -  Mtn for Summary Judgment -5-12  Advertising  -  -
Dckt #81-6 - SAC Exh 6 - Ack of Policy
Dckt #81-7 - Transmittal to Sigma SAC Exh 7
Dckt #81-8 - SAC Exh 8 - Finra Claim
Dckt #81-9 - SAC Exh 9
Dckt #81-10 - SAC Exh 10 McCluskey to Co- w- attachments
Dckt #81-12 - SAC Exh 12 - Gotham Cont Decline
Dckt #81-13 - SAC Exh 13 Knowles Disappointment
Dckt #81-14 -  Escalation SAC Exh 14
Dckt #81-15 - Sigma atty to Prosight Atty SAC Exh 15
Dckt #81-16 - SAC Exh 16 - Further exchanges by Counsel

Dckt #108 - Mtn to Dismiss SAC – Order
Dckt #109 - SAC - Answer by ProSight and Gotham
Dckt #53 - Mtn for Partial Summary Judgment - Minute Order
SFC026560 Knowles Still hopping
SFC026561 - Cal Surance Qte to Sigma 07-12-2012
SFC031979 - CalSurance Cover Letter- Policy Transmittal
SFC031980 - Excess Policy attached to Transmittal
Excerpts from deposition transcript of Paul Kush taken on April 26-27, 2017
Excerpts from deposition transcript of Robert Bednarik taken on April 27, 2017


Website archives –Cadence Landing Page, Security and Our Services
Michigan FAQ's on Producer Licensing, Surplus Lines Licensees and placing with Non-Admitted Insurers